# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ARTISAN AND TRUCKERS
CASUALTY COMPANY,

                   Plaintiff,

and

ZSF TRANSPORT LLC,

                 Involuntary Plaintiff,

v.

PACCAR INC. *by administrator d/b/a*
KENWORTH TRUCKING
COMPANY,

                   Defendant.

Case No. 23-CV-219-JPS

## ORDER

## 1.  INTRODUCTION

In February 2023, Defendant PACCAR Inc. by administrator Kenworth Truck Company ("PACCAR" or "Defendant") removed this breach of warranty action to federal court. ECF Nos. 1, 1-1. Defendant now moves for summary judgment against Plaintiff Artisan and Truckers Casualty Company ("Artisan" or "Plaintiff"). ECF No. 16. For the reasons discussed herein, the Court will grant in part and deny in part the motion.

## 2. FACTS AND FACT-RELATED ARGUMENTS

### 2.1 Parties' Joint Statement of Undisputed Facts[1]

Plaintiff is a licensed insurance company. Defendant is a corporation that was involved in the design, manufacture, and distribution of a new 2022 Kenworth T680, VIN IXKYDP9XONJ142855 (the "Vehicle") that is the subject of this lawsuit.

In August 2021, involuntary plaintiff ZSF Transport LLC ("ZSF") leased the Vehicle from Wisconsin Kenworth. The Vehicle came with a Basic Warranty which provided, in relevant part, that

> Kenworth warrants . . . that the Kenworth vehicle . . . identified below will be free from defects in materials and factory workmanship ("Warrantable Failures") appearing under normal commercial use and service during the time or mileage limitations set forth in the attached Warranty Schedule . . . .
>
> YOUR SOLE AND EXCLUSIVE REMEDY AGAINST KENWORTH ARISING OUT OF YOUR PURCHASE AND USE OF THIS VEHICLE IS LIMITED TO THE REPAIR OR REPLACEMENT OF "WARRANTABLE FAILURES" AT AUTHORIZED UNITED STATES AND CANADIAN KENWORTH DEALERS SUBJECT TO KENWORTH'S TIME AND MILEAGE LIMITATIONS LISTED [AS ATTACHED]. . . .
>
> **WARRANTY DISCLAIMER AND LIMITATIONS OF LIABILITY**
>
> **This limited warranty is the sole warranty made by Kenworth. Except for the above limited warranty, Kenworth**

---

[1] This recitation of facts is primarily drawn—with minor, non-substantive edits—from the parties' agreed upon statement of facts, ECF No. 21, unless otherwise cited. Internal citations therein have been omitted for brevity, and some facts have been omitted as ultimately immaterial. When the Court draws facts from the parties' separate sets of itemized disputed facts or from other areas of the record, it so notes with citations.

**makes no other warranties, express or implied.**
KENWORTH EXPRESLY DISCLAIMS ANY WARRANTY
OF MERCHANTABILITY OR FITNESS FOR A
PARTICULAR PURPOSE.
. . .

Damage due to accident, misuse, abuse, neglect, negligence,
improper or insufficient maintenance, or unauthorized
modification is not warranted.

In addition to the Basic Warranty, ZSF also purchased a "4yr/500k
Extended Engine Warranty." The Extended Engine Warranty similarly
provided that "PACCAR warrants directly to you that the PACCAR MX
engine ('Engine') . . . will be free from defects in materials and factory
workmanship ('Warrantable Failures') appearing under normal
commercial use and service during the time or mileage or hour limitations
set forth . . . ."

On January 3, 2022, the Vehicle was serviced by Wisconsin Kenworth
in Wisconsin. The invoice for that service shows that the customer
complained of a power steering leak and that this issue was corrected by
"TIGHTEN P/S FILTER CHECK FILLER CAP. CLEAN OFF RESERVOIR
RECHECK FOR LEAKS—NONE FOUND."

On January 13, 2022, the Vehicle was served by MHC Kenworth in
Oklahoma. No issue or defect with the power steering was noted on the
service invoice.

On January 18, 2022, a ZSF employee ("Riaz") was driving the
Vehicle in Illinois when it collided with a median barrier. Police cited Riaz
for Improper Lane Usage-Crossing Lane Boundary Unsafely. The citation
describes visibility at that time as "night" and road conditions as "dry." The

Vehicle was towed from the scene at 11:35 P.M. The tow report described the damage as "HEAVY FRONT END DRIVER SIDE."

ZSF presented a warranty claim to Defendant in June 2022, which Defendant denied on the bases that its investigation found "the accident was the result of driver error" and "[t]here is no evidence of a manufacturing defect." Plaintiff contends that the Vehicle's 'power steering reservoir became disengaged, which allowed power steering fluid to leak out and cause the accident."[2]

## 2.2    Expert Witness

Plaintiff retained John Zeirke, P.E., ACTAR ("Zeirke") to inspect the Vehicle and serve as its expert witness in this case. Before recounting his opinions rendered in this case, the Court will address preliminarily Defendant's contention that Zeirke's opinions are not reached "to a reasonable degree of professional certainty." ECF No. 17 at 8.

### 2.2.1    Rule 702 of the Federal Rules of Evidence

First, the Court will address Defendant's contention in its brief in support of its motion for summary judgment that Zeirke's conclusions are not reached to a reasonable degree of professional certainty—an assertion Defendant repeatedly makes without citation to any authority. *Id.* Defendant utilizes the phrase "to a reasonable degree of professional certainty" no less than six times in its brief in support of its motion for

_____

[2]Defendant offers as a disputed fact that "[t]he loss of power steering assist in the Vehicle does not eliminate the ability to steer the Vehicle." ECF No. 22 at 2. To the extent that Plaintiff disputes this fact, such a dispute is not genuine. Plaintiff's own expert witness confirmed this fact in his deposition. *See infra* Section 2.2; ECF No. 18-3 at 22.

summary judgment, but at no point does Defendant expand on what that phrase means or how it should be assessed.[3]

The Court declines to address the merits of this issue at this juncture. First, as noted, the issue is inappropriately briefed, conclusory, and lacks citation to appropriate authority. And in any event, Defendant's contention sounds in Rule 702 and may therefore be raised in a proper Rule 702 motion, as set forth in both the Court's revised trial scheduling order and its pretrial procedures order. *See Teresko v. Liberty Mut. Ins. Co.*, No. 22-CV-1532-JPS, 2023 U.S. Dist. LEXIS 190505, at \*16–17 (E.D. Wis. Oct. 24, 2023) ("[T]his is a clear Rule 702 issue that may be taken up separately from the instant motion, should [Defendant] wish to renew the issue in that form."); ECF No. 10 (setting deadline of March 11, 2024 for Rule 702 motions); ECF No. 3 at 8 (setting forth procedures specific to Rule 702 motions); *see also Polson v. Cottrell, Inc.*, No. 04-0882-DRH, 2007 WL 518652, at \*4 (S.D. Ill. Feb. 15, 2007).

### 2.2.2 Zeirke's Opinions

The Court now recounts Zeirke's opinions rendered in this case. Zeirke did not conduct a reconstruction of the accident, and his report

---

[3]Through its own research, the Court concludes that this repeated phrase appears to stem from Wisconsin evidentiary standards. *See, e.g., State v. Ruetten,* 451 N.W.2d 805, 1989 Wisc. App. LEXIS 1128, at \*2 (Wis. Ct. App. 1989) ("Experts have always been required to testify to a reasonable degree of professional 'certainty' or 'probability.'") (citing *McGarrity v. Welch Plumbing Co.*, 312 N.W.2d 37, 44 (Wis. 1981) and *Pucci v. Rausch*, 187 N.W.2d 138, 142 (Wis. 1971)). But Wisconsin evidentiary standards regarding expert witnesses do not apply in federal court. *C.W. v. Textron, Inc.,* 807 F.3d 827, 834 (7th Cir. 2015) ("Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 . . . (1993), govern the admission of expert testimony in federal courts, even when . . . jurisdiction rests on diversity.") (citing *Wallace v. McGlothan*, 606 F.3d 410, 419 (7th Cir. 2010)).

"contains all of his opinions and conclusions reached regarding his analysis." The parties jointly inspected the Vehicle on April 21, 2022 (the "Inspection"). Zeirke issued an expert report dated July 13, 2023. ECF No. 18-2.

Zeirke noted that, at the time of the Inspection, the Vehicle's steering shaft was undamaged and in working order, but the "power steering reservoir . . . was empty . . . and the filter was missing." *Id.* at 4, 6; *id.* at 5 ("The power steering spin-on filter was missing from the reservoir . . . ."). "The missing power steering fluid filter was not consistent with being the result of the collision damage; thus, this condition most likely preexisted the reported crash." *Id.* at 4. Notwithstanding his contention that at the time of the Inspection the power steering reservoir was "empty," he also wrote at another point that the reservoir was "mostly empty," and that "[d]uring the first few rotations of the steering wheel, power steering fluid was pumped out of the reservoir . . . ." *Id.* at 5, 6, 7.[4] He noted that the Vehicle "had a documented history of leaks caused by a loose power steering fluid filter." *Id.* at 6.

Zeirke wrote that "[a] sudden, unexpected, loss in power steering assist had the potential to result in a loss of vehicle control" because such an event would cause the system to "revert[] to mechanical backup steering, which requires greater effort by the operator." *Id.* at 4, 7. "The loss of the

---

[4]Defendant offers as a disputed fact that "[a]t the time the Vehicle was inspected, rotating the steering wheel pumped power steering fluid out of the reservoir." ECF No. 22 at 2. To the extent that Plaintiff disputes this fact, such dispute is not genuine because Plaintiff's own expert witness asserted this fact in his report. ECF No. 18-2 at 7 ("At the time of the [Inspection], the reservoir was mostly empty. The remaining amount of fluid was pumped out through the filter housing when the steering wheel was turned.").

power steering fluid filter allowed fluid to evacuate from the system, resulting in the loss of steering power assist prior to the crash." *Id.* at 7.

He also concluded that "[s]imilar Kenworth T680 trucks in the ZSF fleet exhibited issues related to the power steering fluid reservoir that may have a common root cause." *Id.* at 4; *id.* at 5–6 (discussing two other 2022 Kenworth T680 trucks in the fleet that "reportedly had a history of leaks coming from the power steering fluid reservoir"). He noted that "five total trucks" in the fleet (including the Vehicle) experienced "steering fluid leaks." *Id.* at 6. The power steering fluid leakage of one vehicle in the fleet was found to have been caused by a "loose hose connection to the reservoir," and that of three other vehicles was caused by cracked power steering fluid reservoirs. *Id.* During the Inspection, a running 2022 Kenworth T680 with a PACCAR engine was compared with a running 2022 Kenworth T680 with a Cummins engine. *Id.* The reservoir on the T680 with the PACCAR engine "vibrat[ed] noticeably more" than that of the other vehicle. *Id.* This, along with the fact that none of ZSF's T680s with Cummins engines had experienced power steering fluid leakage issues, led Zeirke to opine that the difference in "vibration loads" could be the "common root cause" behind power steering fluid leaks in both the instant Vehicle and the other T680s with PACCAR engines in ZSF's fleet. *Id.* at 7.

At his deposition, Zeirke confirmed that his report "contains all [the] conclusions that [he] reached in this case." ECF No. 18-3 at 11. He confirmed that he did not know whether the power steering filter was present at the crash site following the accident. *Id.* at 13. Zeirke also confirmed that he did not "have an opinion to a reasonable degree of certainty that the loss of power steering control was the cause of this accident"; in response to a question regarding causation, he responded: "Considering I did not

reconstruct the accident, I can't say that it directly caused; I said it had the potential to cause." *Id.* at 18. Similarly, the deposition continued as follows:

> Q:  What is your—how did this filter come off of this unit at the time of the accident? If you have an opinion. Do you know?
>
> A:  It loosened up and come off.
>
> Q:  So it's your opinion that this . . . power steering filter on this vehicle, between January 13th of 2022 and January 18th, 2022, loosened by itself and fell off?
>
> A:  I'm saying, based on the information that I've reviewed as part of this, that that seemed like a plausible explanation.
>
> Q:  So . . . it's your opinion . . . that the reason that this filter came off between January 13th and January 18th is that it untightened itself to the point where it just dropped off.
>
> A:  I believe that is definitely a possibility. I don't have one opinion on exactly what happened. There could have been other issues.
>
> Q:   . . . What is your opinion to a reasonable degree of certainty, if you have one, as to why this power steering filter came off between January 13th, 2018 [sic], and the day of the accident?
>
> A:  I guess I can't say for sure.
>
> Q:  So you have no such opinion then.
>
> A:  No, I don't have an opinion of exactly how the filter came off of that truck . . . .
>
>  . . .
>
> Q:   . . . I'm just asking you, is it fair to state, then, that you do not have an opinion, to a reasonable degree of probability or certainty, as to why the filter came off between January 12th, . . . 2022, and January 18th, 2022?
>
> A:  Yeah, I did not make an opinion on that and so I don't have anything beyond what's in the report.

*Id.* at 19–20. On cross examination, Zeirke was asked about "some potential causes of a power steering reservoir becoming disengaged." *Id.* at 21. He noted "[v]ibration" and "[n]ot having [the filter] fully tight" as "the two most plausible" potential causes. *Id.* He also noted that "the expectation" is that the filter would not "loosen[] on its own." *Id.* at 22. Lastly, on redirect, Zeirke confirmed that he "ha[d] no information one way or another as to whether . . . the power steering filter was appropriately torqued [when] it left the dealership in early January of 2022" and that "the loss of power steering assist in th[e] [V]ehicle does not eliminate the ability to steer" but rather "[j]ust makes it more difficult." *Id.*

### 2.3    Driver Statement

Riaz wrote a first-person account of the accident the day after it occurred. ECF No. 24-4.[5] The statement provides, in relevant part, that

> [Riaz] was . . . going north on I-55 heading into Illinois when all of a sudden [his] steering got stiff and locked up on [him]. [Riaz] was traveling in a low speed and trying to stop the vehicle with a locked up steering. In order to safe [sic] li[ves] and avoid the cars in front of [him][,] [he] swerve [sic] to the right to pull to a safe ramp. In doing so [he] hit the barricade and the side median.

*Id.* In its reply and in objection to Plaintiff's statement of disputed facts, Defendant asserts that Riaz's statement is inadmissible hearsay and therefore cannot be considered on summary judgment. ECF No. 26 at 3; ECF No 27 at 12 ("[T]he declarant, the driver, did not make the statement while testifying under oath . . . and [Plaintiff] seeks to offer the statement into evidence to prove the truth of the matter asserted . . . ."). Defendant argues

---

[5] Plaintiff also represented in its responses to interrogatories that Riaz is "expected to testify regarding the events leading up to the accident." ECF No. 18-11 at 3.

that "none of the hearsay exceptions apply to save the statement from exclusion" and that Plaintiff has not established the statement's admissibility. ECF No. 27 at 12. Because it was raised only in objection to Plaintiff's facts and on reply, Plaintiff did not have an automatic opportunity to address this evidentiary argument, although Plaintiff could have moved for leave to file a sur-reply to address the issue.[6]

The Court agrees that Riaz's statement is inadmissible hearsay. It is an out-of-court statement not made under penalty of perjury, and it is offered for the truth of the matter asserted; specifically, Plaintiff offers it in support of the assertion that the steering locked up suddenly while Riaz was driving, thereby causing the accident. ECF No. 23 at 1–2, 6. The statement does not constitute a present sense impression because that exception requires the declarant to have made the statement during or immediately after the event described. *Bagwe v. Sedgwick Claims Mgmt. Servs.*, 811 F.3d 866, 883 n. 54 (7th Cir. 2016) (quoting *United States v. Ruiz*, 249 F.3d 643, 646 (7th Cir. 2001)).

Nor does the Court consider it appropriate to consider the statement under the residual exception of Rule 807 of the Federal Rules of Evidence. That rule provides that "a hearsay statement is not excluded by the rule

---

[6]Typically, arguments raised for the first time on reply are forfeited, but Defendant justifiably raised the issue after Plaintiff cited to Riaz's statement as support in its brief in opposition. Accordingly, the hearsay argument has not been forfeited. *See Williams v. Duncan,* No. 3:17-CV-376-MAB, 2020 U.S. Dist. LEXIS 78679, at *26 n.8 (S.D. Ill. May 5, 2020) ("Arguments raised for the first time in a reply brief are not normally considered . . . . An exception exists, however, when the reply is prompted by an argument in the response brief that was not addressed in the initial motion.") (citing *Narducci v. Moore,* 572 F.3d 313, 324 (7th Cir. 2009); *Cent. States, Se. & Sq. Areas Pension Fund v. White,* 258 F.3d 636, 640 n.2 (7th Cir. 2001); and *Matter of Wildman*, 859 F.2d 553, 556 n.4 (7th Cir. 1988)).

against hearsay" if "the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement" and "it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a). It is entirely unclear why Plaintiff could not have obtained Riaz's statement via deposition or through a sworn statement. The Court sees no reason why Plaintiff could not, through "reasonable efforts," have obtained "other evidence" not constituting hearsay to support Riaz's assertion that the steering suddenly locked up on him and ultimately caused him to crash. *See Turner v. Brown,* No. 17-cv-764-JDP, 2019 U.S. Dist. LEXIS 172618, at *8 (W.D. Wis. Oct. 4, 2019) ("In general, if a party could simply subpoena a witness who made the hearsay statement, the party could not rely on the residual exception to introduce the hearsay statement at trial.") (citing *Parsons v. Honeywell,* 929 F.2d 901, 907–08 (2d Cir. 1991) and *United States v. Zapat*a, 356 F. Supp. 2d 323, 328 (S.D.N.Y. 2005)). Accordingly, the Court will not consider Riaz's statement for purposes of this Order.

### 2.4    Sabir Deposition

Shahzad Sabir ("Sabir") testified that he is the owner of ZSF. ECF No. 24-1 at 4. He testified that, as of January 2022, he had "22 T680 Kenworth vehicles with PACCAR [MX13] engines" in his fleet and that all of them leaked power steering fluid. *Id.* at 15. His fleet also includes T680s with Cummins engines, and Sabir testified that he had "no power steering leakage concerns with those." *Id.* at 17. He confirmed that drivers perform a pre-trip inspection of their vehicles, which would include checking for any leaks from the vehicle onto the pavement or wheels, and he confirmed

Case 2:23-cv-00219-JPS   Filed 02/12/24   Page 11 of 32   Document 28

that, to his knowledge, there were no such leaks from the Vehicle identified by Riaz's pre-trip inspection on the day of the crash. *Id.* at 18.

He testified that some of his 2022 Kenworth T680s with PACCAR engines had "broken" power steering fluid reservoirs due to engine vibration, one was "missing a power steering filter," and several had loose power steering filters. *Id.* at 15–16. All these conditions caused power steering fluid to leak. One of those vehicles found to have a loose filter was "involved in a similar accident" as that alleged in this case in which the "steering locked up." *Id.* at 16. Sabir testified that while the Vehicle subject to this suit was discovered to be missing a power steering filter, it was never known to have a cracked power steering fluid reservoir. *Id.* at 15. He also testified that while he had never personally driven a T680 without any power steering fluid in it, he believed that it would be essentially "impossible" to do so. *Id.* at 16.

## 2.5 Dispute Over Consideration of Power Steering Related Issues in the Other T680s with PACCAR Engines

Plaintiff relies on the history of power steering-related issues in these other 2022 Kenworth T680s with PACCAR engines in the same fleet—acknowledged by both Sabir and Zeirke—as support for the conclusion that "a jury could conclude [that] a defect with the [Vehicle] caused the steering to go out and contributed to causing the accident." ECF No. 23 at 3, 6 (asserting that its theory "aligns with . . . ZSF's history of power steering fluid leaks likely caused by vibration on other 2022 Kenworth T680s during the winter months"); ECF No. 27 at 7 ("[Plaintiff] contends that the combination of . . . Sabir's testimony and review of maintenance history of other vehicles in ZSF's fleet demonstrates a history of defects."). On reply, Defendant argues that Plaintiff cannot rely on this evidence because

"evidence of other incidents is admissible only if it involves similar circumstances to those at issue in this case." ECF No. 27 at 8 (citing *Earl v. Gulf & W. Mfg. Co.*, 366 N.W.2d 160 (Wis. Ct. App. 1985) and *Weir v. Crown Equip. Corp.*, 217 F.3d 453, 457 (7th Cir. 2000)).[7] Again, while Plaintiff did not have an automatic opportunity to address this argument, Plaintiff could have sought—but did not—to do so via sur-reply.

"The general rule is that prior accidents are admissible as evidence . . . ." *Lobermeier v. Gen. Tel. Co. of Wis.*, 349 N.W.2d 466, 476 (Wis. 1984) (citing *Netzel v. State Sand & Gravel Co.*, 186 N.W.2d 258, 263 n.18 (Wis. 1971) and *Callan v. Peters Constr. Co.*, 288 N.W.2d 146, 149 (Wis. 1979)). "Admissibility of prior incidents is generally left to the discretion of the trial court." *U-Line Corp. v. Ranco N. Am., LP*, 713 N.W.2d 192, ¶ 40 (Wis. Ct. App. 2006) (citing *Lobermeier*, 349 N.W.2d at 476).

"In determining whether to admit evidence of other incidents to show the probability of the defect in question, similarity is critical*." Id.*, ¶ 40) (citing *Netzel,* 186 N.W.2d at 263). "Evidence of other accidents or similar occurrences at the same place or under similar conditions and circumstances may be admissible to show the probability of the defect in question [and] that the injury was caused by the defect . . . ." *Id.* (quoting *Netzel*, 186 N.W.2d at 263). Ultimately, it is Plaintiff's burden, as the proponent of that evidence, "to show similarity between the" power steering fluid leak in this case and that of the other 2022 Kenworth T680s with PACCAR MX13 engines. *Id.*, ¶ 41.

---

[7] The Court concludes that this evidentiary argument is not forfeited for the same reason that Defendant's hearsay argument was not forfeited. *See supra* note 6.

The Court will exercise its discretion to consider, for purposes of this motion, evidence of the other 2022 Kenworth T680s with PACCAR MX13 engines that experienced power steering fluid leaks. Those other vehicles were designed and manufactured at the same time, by the same party or parties, and to the same specifications. They contained identical PACCAR MX13 engines. The vehicles were, for lack of a better term, of the same "batch." They operated out of the same facility—ZSF. It is true that the power steering fluid leaks of those other vehicles did not manifest entirely uniformly—in some instances the leaks apparently occurred due to a cracked reservoir, in others due to a loose filter, and in another due to a loose hose connection on the reservoir. ECF No. 18-2 at 6. But in each case the outcome was the same: power steering fluid leaks that would not otherwise have been expected to occur. Both Sahir and Zeirke pointed to engine vibration as a potential root cause for these issues. ECF No. 18-2 at 7; ECF No. 24-1 at 17. The Court is therefore satisfied that the evidence relating to power steering fluid leakage in those other T680s with PACCAR engines is sufficiently similar to warrant consideration in this case.

3.    **LEGAL STANDARD**

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005).

Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994). But simply "denying a fact that has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (quoting *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015)).

**4.     LAW AND ANALYSIS**

Defendant moves for summary judgment on Plaintiff's sole claim: breach of warranty, both implied and express.

### 4.1     Breach of Implied Warranties

Defendant first argues that Plaintiff cannot succeed on a theory of breach of an implied warranty—either of merchantability or fitness for a particular purpose—because Defendant disclaimed all implied warranties. ECF No. 17 at 5. Plaintiff responds that the Basic Warranty "does not

properly disclaim any implied warranties" because the disclaimer language is not conspicuous. ECF No. 23 at 10–13.[8]

Wis. Stat. § 402.316(2) provides that "to exclude or modify the implied warranty of merchantability or any part of it[,] the language must mention merchantability and in case of a writing must be conspicuous . . . ." Similarly, "to exclude any implied warranty of fitness[,] the exclusion must be by a writing and conspicuous." *Id.* "Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'" *Id.*

Wis. Stat. § 401.201(2)(f) provides that "'[c]onspicuous,' . . . means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is 'conspicuous' or not is a decision for the court.'" It provides further that

> [c]onspicuous terms include any of the following:
>
> 1. A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size.
>
> 2. Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from

---

[8] Plaintiff also references the fact that, in order to be enforceable, a disclaimer must not be unconscionable, but Plaintiff does not actually analyze whether the disclaimer in this case is unconscionable. ECF No. 23 at 10 (citing Wis. Stat. § 402.316 and *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513, 518 (Wis. 1978)). For example, Plaintiff does not acknowledge that unconscionability must be demonstrated both procedurally and substantively. *Dry Dock, LLC v. Godfrey Conveyor Co.*, 717 F. Supp. 2d 825, 834 (W.D. Wis. 2010). Accordingly, the Court will not address the issue of unconscionability. *See Bakery Bling v. Matrix Packaging Mach., LLC.*, No. 21-CV-1399-JPS, 2023 U.S. Dist. LEXIS 133816, at *87–88 (E.D. Wis. Aug. 2, 2023) (declining to find that inclusion of disclaimer language in contract was unconscionable where "th[e] issue [wa]s not appropriately briefed . . . .").

surrounding text of the same size by symbols or other marks that call attention to the language.

*Id.*

The disclaimer language at issue appears as provided below:



ECF No. 18-1 at 1.

The Court concludes that the disclaimer language is sufficiently conspicuous, but it is a close case. The Court agrees with Plaintiff that the body text is of questionable size. ECF No. 23 at 13; *Colleran v. Wildes,* 886 N.W.2d 592, ¶ 13 (Wis. Ct. App. 2016) (noting as relevant to finding of conspicuousness that "the font of the entire contract . . . is sufficiently large to be easily read"). The text here is not so small as to be unreadable, but very nearly so. The form also lacks full margins; the text extends close to the long edge of the paper. *Cf. Colleran,* 886 N.W.2d, ¶ 13 (noting as relevant to finding of conspicuousness that "[t]here are large margins on both sides of each page . . . ."). And it is true that capital lettering and bold font is used in other portions of the Basic Warranty and not just for the disclaimer language, reducing somewhat the distinctive effect of the capital lettering and bold font. ECF No. 23 at 13.

But the disclaimer language Heading ("Warranty Disclaimer and Limitations of Liability") is set out in its own line of text and represents one of only three instances of the use of capital lettering in conjunction with bold font. It does, therefore, at least to some extent, stand out from the surrounding body text, the majority of which is not capitalized and not bolded.

Further, contrary to Plaintiff's argument, the fact that some other portions of the form are also emphasized does not necessarily mean that one such portion is not conspicuous. ECF No. 23 at 13 ("While the disclaimer has some bold-face type, it is not the only provision bolded."); *see Stenulson v. Hunzinger Constr. Co.*, 743 N.W.2d 167, ¶ 13 (Wis. Ct. App. 2007) ("[I]f the presence of other similar conspicuous type in a contract rendered the . . . provision inconspicuous, such a standard would preclude parties from making more than one provision of their contract conspicuous.") (internal quotation marks omitted). Not including the attached Warranty Schedule, the Basic Warranty takes up just one page, and is not therefore an "onerous form." ECF No. 18-1 at 1; *Deminsky v. Arlington Plastics Mach.*, 657 N.W.2d 411, ¶ 29 (Wis. 2003) (finding that the relevant form's being merely "one page, front and back" supported a finding of conspicuousness). Additionally, the second sentence of the form instructs the reader to "**PLEASE READ THIS LIMITED WARRANTY CAREFULLY**." ECF No. 18-1 at 1. In light of the foregoing, the Court finds Defendant's disclaimer of the implied warranties of merchantability and fitness for a particular purpose to be conspicuous. Accordingly, the

disclaimer is enforceable, and Plaintiff cannot proceed on a theory of breach of an implied warranty.[9]

### 4.2 Breach of Express Warranty

Defendant also moves for summary judgment on Plaintiff's claim of breach of express warranty. As noted, the warranty in this case provided that the Vehicle would be "free from defects in materials and factory workmanship." ECF No. 21 at 2. The defect Plaintiff alleges is the "power steering reservoir becoming disengaged." ECF No. 1-1 at 6.

"Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Wis. Stat. § 402.313(1)(a). "A warranty is an assurance by one party to a contract of the existence of a fact upon which the other party may rely . . . . It amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue." *White v. Marshall*, 693 F. Supp. 2d 873, 882 (E.D. Wis. 2009) (cleaned up) (citing *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 794 F. Supp. 1370 (E.D. Wis. 1992)). "[T]he party relying on a breach of warranty has the burden of proof 'to show the warranty, the breach thereof, and that his . . . loss resulted from the breach of such warranty.'" *Id.* (quoting *Badzinski v. Patnode*, 652 N.W.2d 133, ¶ 14 (Wis. Ct. App. 2002)).

Defendant cites to Wis. Stat. § 895.047, entitled "Product liability," for the proposition that "the plaintiff must overcome the presumption that the product . . . is not defective." ECF No. 17 at 3 (quoting Wis. Stat. § 895.047(3)(b) ("Evidence that the product, at the time of sale, complied in

---

[9]This conclusion moots the parties' provision of proposed jury instructions related to implied warranties. ECF No. 19 at 15–16.

material respects with relevant standards, conditions, or specifications adopted or approved by a federal or state law or agency shall create a rebuttable presumption that the product is not defective.")). But this is not a product liability case. This is a breach of warranty case, and § 895.047 expressly provides that it "does not apply to actions based on a claim of . . . breach of warranty." Wis. Stat. § 895.047(6). The presumption on which Defendant relies is entirely inapplicable here, and that error permeates much of Defendant's briefing.[10]

In light of the confusion and conflation between breach of warranty (which typically sounds in contract) and product liability (which typically sounds in tort), the Court begins its analysis at a basic level. *See Grain Exch. Condo. Ass'n v. Burke,* 815 N.W.2d 406, ¶ 29 (Wis. Ct. App. 2012) ("In Wisconsin . . . it appears that warranty actions are treated as falling within the law of contract rather than the law of tort.") (citing *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.,* 673 N.W.2d 65, ¶ 35 (Wis. 2004)).[11] Plaintiff must first demonstrate the existence of a warranty. *White,* 693 F. Supp. 2d at 882. That element is met and undisputed in this case.

Second, Plaintiff must demonstrate that Defendant breached the applicable warranty. *Id.* Again, the warranty in this case is that the Vehicle

___

[10]Plaintiff failed to acknowledge the error, leaving the Court to discover it on its own.

[11]*See also Cincinnati Ins. Co. v. AM Int'l, Inc.,* 591 N.W.2d 869, 873 (Wis. Ct. App. 1999) ("[C]ontract law is 'designed to effectuate exchanges and to protect the expectancy interests of parties to private bargained-for agreements[;]' tort law and, in particular, products liability . . . work 'to protect consumers from unreasonably dangerous goods that cause personal injury and damage to other property.'") (quoting *Daanen & Janssen v. Cedarapids, Inc.,* 573 NW.2d 842, 846 (Wis. 1998)). The former circumstance is that which is before the Court; the latter circumstance is not.

would be "free from defects in materials and factory workmanship." ECF No. 21 at 2. This is where the rubber meets the road.

As a threshold matter, the parties appear to agree that expert testimony is required to determine whether the Vehicle suffered from such a defect. ECF No. 17 at 3–4; ECF No. 23 at 7 ("[Plaintiff] can use a combination of expert testimony and circumstantial evidence to establish [the alleged defect]."); *State v. Whitaker*, 481 N.W.2d 649, 650 (Wis. Ct. App. 1992) ("[E]xpert testimony is *required* . . . if the issue to be decided by the jury is beyond the general knowledge and experience of the average juror.") (citing *Kujawski v. Arbor View Health Care Ctr.*, 407 N.W.2d 249, 252–53 (Wis. 1987)).

Defendant argues that "[t]here is no expert testimony or evidence that any portion of the power steering assembly, filter, or reservoir in the Vehicle contained a defect in materials or factory workmanship." ECF No. 17 at 7. But in the Court's estimation, Defendant expects too much of Plaintiff at this stage and has too constrained a definition of "defect." "Proof of a defect in breach of warranty actions does not require proof of the defect's *cause*." *Schrimpf v. GMC*, 321 N.W.2d 364, 1982 Wisc. App. LEXIS 3503, at *6 (Wis. Ct. App. 1982) (emphasis added); *see also Schweiger v. Kia Motors Am., Inc.*, 830 N.W.2d 723, ¶ 42 (Wis. Ct. App. 2013) (Lemon Law context) ("If Kia is arguing that [the plaintiff] had to show which particular component or components of the vehicle were defective in order to show a defect in material or workmanship, that argument lacks merit . . . .") (citing *Dobbratz Trucking & Excavating, Inc. v. PACCAR, Inc.*, 647 N.W.2d 315 (Wis. Ct. App. 2002)).

In *Schrimpf,* the plaintiff sued for "breach of [the] limited warranty on a 1978 Suburban truck" after experiencing consistent difficulty with the

vehicle's steering, even after repeated maintenance. *Id.* at *1–3 ("He . . . returned it to the dealer for servicing . . . four or five times" but "[t]he steering continued to be a problem"). Eventually fed up, the plaintiff demanded a refund from the defendant, GMC. *Id.* at *3. When GMC failed to respond, the plaintiff sued for breach of warranty, alleging that "the vehicle had 'substantial and serious steering difficulties . . . .'" *Id.* At trial, an expert witness (the manager of the repair shop where the Suburban had been serviced) testified that the plaintiff brought the Suburban in for maintenance five or six times and that the Suburban's steering was "very sensitive and . . . abnormal compared to other four-wheel drive vehicles he had handled." *Id.* at *4. A special verdict asked: "Was there a defect in materials or workmanship of the steering capacity of the plaintiff's . . . Suburban . . . ?" *Id.* at *5. The jury answered in the affirmative. *Id.*

On appeal, GMC argued that the plaintiff's expert had failed to "identify a specific mechanical defect." *Id.* at *6 ("Because [the plaintiff] did not provide expert testimony to identify a specific mechanical defect, GMC argues that [the plaintiff] failed to prove that a defect existed under the warranty."); *id.* at *9 ("GMC argues that [the plaintiff] failed to meet his burden of proof because [the manager's] testimony did not establish the existence of a defect in material or workmanship."). The Wisconsin Court of Appeals disagreed:

> [The plaintiff] proved to the satisfaction of the jury that the steering in his Suburban was defective. He presented . . . testimony of several witnesses that the Suburban's steering was abnormal . . . . [T]here was testimony from . . . a mechanic[] that when he drove [the] Suburban, he had to fight the steering wheel constantly to keep the truck on the road. [The mechanic] also stated that the steering was not similar to other four-wheel drive vehicles he had handled . . . . [The]

mechanic and manager of a tire store[] testified as an expert witness that [the] Suburban handled abnormally.

*Id.* at *8.

The Wisconsin Court of Appeals also rejected GMC's contention that the plaintiff had failed to meet his burden on his breach of express warranty claim because his expert witness had failed to specifically identify the precise *cause* of the steering problem. The expert witness's testimony, the court wrote, "was not rendered inadmissible because he could not identify the specific cause of the steering problem." *Id.* at *10–11. His testimony, "along with that of the other witnesses, was sufficient to prove that a defect in material or workmanship existed under the terms of the warranty." *Id.*

The same is true here. Defendant asserts that Plaintiff fails to identify a defect falling within the scope of the warranty because Zeirke could not say for sure what caused the power steering filter to fall out and the power steering to disengage. ECF No. 27 at 2. But Defendant demands too much.

Zeirke identified at the Inspection of the Vehicle that its steering components (steering shaft, steering column, gearbox, and power steering reservoir) were undamaged from the collision, but that the power steering filter was missing, and the reservoir was very nearly empty. ECF No. 18-2 at 5, 7. He concluded that the missing filter "most likely preexisted the . . . crash," in part because "the threads on the reservoir for the filter were not damaged . . . as [he] would expect [to be the case] if the filter was impacted" in the crash. *Id.* at 6–7; ECF No. 18-3 at 15. He further concluded that the "loss of the power steering fluid . . . result[ed] in the loss of steering power assist prior to the crash" because "if the filter spun out, you would lose hydraulic pressure . . . fairly quickly and the power steering would not function . . . ." ECF No. 18-2 at 6–7; ECF No. 18-3 at 16. He testified that the

expectation was that the power steering filter should not fall off on its own. ECF No. 18-3 at 22. Because he saw "no evidence that the steering gear had any issues," because the power steering filter "most likely" fell out before the crash, and considering both the Vehicle's and its identical counterparts' documented history of power steering related issues, Zeirke concluded that there "was a loss of power steering fluid prior to th[e] incident" which "had the potential to cause" the accident. ECF No. 18-3 at 15, 18; ECF No. 18-2 at 6–7.

As the court explained in *Schrimpf*, Zeirke did not have to specifically identify *why* the filter fell off; the fact that the power steering filter fell off at all—after having been serviced and tightened a mere two weeks prior—is, when considered in conjunction with the other evidence in this case, suggestive enough of a defect in "materials or factory workmanship." *Schrimpf*, 321 N.W.2d 364, 1982 Wisc. App. LEXIS 3503, at *10–11 (rejecting defendant's contention that plaintiff's expert failed to "establish the existence of a defect in material or workmanship" when expert identified a "steering problem" but could not "identify the specific cause" thereof). In fact, Plaintiff has already gone farther than the plaintiff in *Schrimpf*: while the plaintiff's expert in *Schrimpf* was unable to "identify the specific cause of the steering problem," here, Zeirke has already opined that the steering issue in the Vehicle—and in the other 2022 T680s with PACCAR engines—may be due to "the amount of vibration at th[e] reservoir area" attributable to the PACCAR engine. ECF No. 18-3 at 18.

Defendant asserts that the fluid filter falling out, causing power steering fluid to leak out of the reservoir and resulting in disengagement of power steering, "does not establish a defect." ECF No. 27 at 2 ("The *defect in materials or factory workmanship* needs to be identified and supported by

expert testimony . . . .”). Defendant cites no authority in support of that assertion, and relevant case law refutes it. Plaintiff has proffered sufficient evidence—both circumstantial and in the form of expert testimony—for a reasonable juror to find the presence of a defect in “materials or factory workmanship.”

Next, Defendant contends that Plaintiff fails to show that the “loss resulted from the breach of” the warranty—i.e., that the alleged defect caused the accident. *White,* 693 F. Supp. 2d at 882 (quoting *Badzinski,* 652 N.W.2d, ¶ 14). Specifically, Defendant contends that Plaintiff has not proffered sufficient admissible evidence in support of its contention that the accident was caused by the disengagement of the power steering in the Vehicle. As discussed *supra* Section 2.3, Riaz’s statement (that the steering locked up on him and caused the accident) is inadmissible hearsay and cannot be considered on summary judgment.

But the Court does not agree that Plaintiff fails to adduce sufficient evidence from which a reasonable juror could find causation in the absence of Riaz’s statement. There are several other pieces of evidence from which a juror could reasonably infer that the accident was caused by a power steering failure. As discussed above, Zeirke opined that it was most likely that the Vehicle experienced a loss of power steering before the accident due to the power steering filter becoming separated from the reservoir, which would have rendered steering, at a minimum, very difficult. Additionally, Sahir testified that he had multiple other 2022 Kenworth T680s with PACCAR engines from the same fleet that experienced power steering related issues, including one that was also involved in an accident after “los[ing] power steering fluid.” ECF No. 24-1 at 16. In light of all this, a juror could reasonably infer that the accident was caused by a power

steering disengagement, as opposed to, for example, driver error. Accordingly, the Court will deny Defendant's motion for summary judgment to the extent that it seeks dismissal of Plaintiff's breach of express warranty claim.

### 4.3    Limited Remedy: Repair or Replace

Plaintiff also argues that, to the extent that Defendant "intends to argue [that] its warranty limits its obligation to repair or replacement of the offending part, such a limitation fails the essential purpose of the warranty." ECF No. 23 at 9. Defendant does not address this argument in its reply and has therefore forfeited any opposition it may have had to it. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.") (citing *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008) and *Williams v. REP Corp.*, 302 F.3d 660, 667 (7th Cir. 2002)).

The warranty in this case provides, as relevant:

> YOUR SOLE AND EXCLUSIVE REMEDY . . . ARISING FROM YOUR PURCHASE AND USE OF THIS VEHICLE [OR ENGINE] IS LIMITED TO THE REPAIR OR REPLACEMENT OF "WARRANTABLE FAILURES" AT AUTHORIZED . . . DEALERS . . . .

ECF No. 18-1 at 1 (basic warranty), 3 (extended engine warranty).

"Wis. Stat. § 402.719 permits the parties to contractually modify or limit the remedies available under the U.C.C." *Tankstar USA, Inc. v. Navistar, Inc.*, No. 2017AP1907, 2018 Wisc. App. LEXIS 890, at *17 (Wis. Ct. App. Nov. 27, 2018). That section provides specifically that

> [an] agreement may provide for remedies . . . in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and

repayment of the price or to repair and replacement of the nonconforming goods or parts . . . .

Wis. Stat. § 402.719(1)(a).

"However, the UCC disfavors limitations on remedies and provides for their deletion where they would effectively deprive a party of reasonable protection against breach." *Murray,* 265 N.W.2d at 520 (citing *Chemetron Corp. v. McLouth Steel Corp.,* 381 F. Supp. 245, 250 (N.D. Ill. 1974)). Accordingly, "the full panoply of U.C.C. remedies is available '[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose.'" *Tankstar USA,* 2018 Wisc. App. LEXIS 890, at *17 (quoting Wis. Stat. § 402.719(2)).

"It is unusual for a remedy to fail of its essential purpose, but this typically occurs when a contract's primary remedy is repair or replacement of defective parts, and this remedy fails to put the goods in their warranted condition." *Sunny Indus. v. Rockwell Int'l Corp.,* Nos. 98-2824, 98-2875, 1999 U.S. App. LEXIS 7001, at *29 (7th Cir. Apr. 12, 1999) (citing *Rudd Constr. Equip. Co. v. Clark Equip. Co.,* 735 F.2d 974, 981 (6th Cir. 1984) and *Hill v. BASF Wyandotte Corp.,* 696 F.2d 287, 292 (4th Cir. 1982)). "Under the UCC, a remedy does not fail of its essential purpose simply because one party struck a bad bargain that it later regrets." *Id.* (citing *JOM, Inc. v. Adell Plastics, Inc.,* 151 F.3d 15, 28 (1st Cir. 1998)). "Moreover, it 'does not mean that an exclusive remedy has "failed of its essential purpose" whenever a contracting party loses money because a limited remedy provision prevents him from being fully reimbursed for the damages caused by the other party's breach.'" *Id.* (quoting *J.D. Pavlak, Ltd. v. William Davies Co., Inc.,* 351 N.E.2d 243, 246 (Ill. App. Ct. 1976)).

Instead, "whether a remedy has failed of its essential purpose turns upon whether the circumstances are such that the buyer has been deprived of the substantial value of the bargain." *Tankstar USA*, 2018 Wisc. App. LEXIS 890, at *18 (citing *Murray,* 265 N.W.2d at 520). "In other words, a contract that purports to limit the remedies available for breach must nonetheless provide 'a fair quantum of remedy.'" *Id*. (quoting *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1010 (7th Cir. 1996)).

"In turn, this principle requires the party claiming breach to demonstrate 'harm that the contractual remedy was incapable of curing.'" *Id*. (quoting *Waukesha Foundry*, 91 F.3d at 1010). "Although it is typically a question of fact whether a 'repair and replace' remedy is inadequate, . . . if the record evidence permits only one conclusion, that question of fact may be answered by the court as a matter of law . . . ." *Id*. at *18–19 (citations omitted).

"[A] 'repair or replace' remedy can fail of its essential purpose in two ways." *Id*. at *19. "The most obvious way is if a seller flatly refuses to accept the good for repair or replacement . . . ." *Id.* That does not appear to have occurred here.

Alternatively, "a 'repair and replace' remedy can fail of its essential purpose if repairs or replacement are so frequently required that the purchaser has been effectively deprived of the benefit of the bargain." *Id.* at *19 (citing *Midwhey Powder Co. v. Clayton Indus.*, 460 N.W.2d 426, 430 (Wis. Ct. App. 1990)); *see also id.* at *22–23 ("To prevail on its claim for consequential and other damages (i.e., to avoid the exclusive and limited remedy contemplated by the manufacturer's warranties and service contracts), [Plaintiff] must demonstrate that repairs have been so frequent

and numerous that it has effectively been deprived of the beneficial use of the product it purchased.").

"The purpose of an exclusive remedy of repair or replacement, from the buyer's standpoint, is to give him goods which conform to the contract . . . within a reasonable time after a defect is discovered." *Murray*, 265 N.W.2d at 520 (citing *Conte v. Dwan Lincoln-Mercury, Inc.*, 374 A.2d 144 (Conn. 1976); *Beal v. Gen. Motors Corp.*, 354 F. Supp. 423 (D. Del. 1973); and *Moore v. Howard Pontiac-American, Inc.*, 492 S.W.2d 227 (Tenn. Ct. App. 1972)). "The buyer of an automobile," for example, "is not bound to permit the seller to tinker with the article indefinitely in the hope that it may ultimately be made to comply . . . ." *Id*. at 521 (citing 46 Am. Jur. Sales § 732 and 77 C.J.S. Sales § 340). "At some point in time, if major problems continue to plague the automobile, it must become obvious . . . that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defect . . . ." *Id*. (quoting *Orange Motors of Coral Gables v. Dade Co. Dairies*, 258 So.2d 319, 320, 321 (Fla. App. 1972)). "In other words, the relevant 'benefit of the bargain' is that the purchaser is able to use the goods, in a meaningful manner, following their repair or replacement." *Tankstar USA*, 2018 Wisc. App. LEXIS 890, at *19–20.

"Where the seller is given reasonable opportunity to correct the defect or defects, and the vehicle nevertheless fails to operate as should a new vehicle free of defects, the limited remedy fails of its essential purpose." *Murray*, 265 N.W.2d at 521 (collecting cases). "This is true regardless of the seller's commendable efforts and considerable expense in attempting to repair or replace a non-conforming product." *Sunny Indus*., 1999 U.S. App. LEXIS 7001, at *31 (citing *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 356 (Minn. 1977)).

Plaintiff's argument on this issue is lacking. Nevertheless, the Court will conclude that the exclusive remedy of repair or replacement fails of its essential purpose here. That conclusion is best demonstrated by the fact that Plaintiff complained of a power steering leak and steering-related issues at a service appointment approximately two weeks before the crash. ECF No. 21 at 3–4. The power steering filter was discovered at that time to be loose. *Id.* at 3. The authorized service facility tightened the filter and confirmed the leak had ceased. *Id.* Nevertheless, the power steering filter again loosened and fell off at some point between January 13, 2022 and January 18, 2022, apparently causing power steering to disengage. *Id.* at 3–4. The Court can therefore conclude that the seller was "given reasonable opportunity to correct the" issue, but the Vehicle "nevertheless fail[ed] to operate as should a new vehicle free of defects." *Murray*, 265 N.W.2d at 521 (collecting cases). That conclusion is similarly supported by Sahir's testimony that he "brought th[e] [power steering issues in the other 2022 T680s with PACCAR engines] to the attention of Wisconsin Kenworth" but that Wisconsin Kenworth was apparently unable to resolve the issue, leading Sahir's own mechanics to attempt to take matters into their own hands by adding clamps onto the power steering components to try to keep them in place. ECF No. 24-1 at 15–17 ("We have 17 repairs so far . . . . [T]hey don't have a solution to this as of [the time of the deposition].").

Particularly in the absence of any argument from Defendant on the issue, the Court is unable to conclude that the record reasonably allows for the inference that Plaintiff would be "able to use the [Vehicle], in a meaningful manner, following . . . repair or replacement." *Tankstar USA*,

2018 Wisc. App. LEXIS 890, at *19–20. Accordingly, Plaintiff's remedy in this case is not limited to repair or replacement.[12]

### 4. CONCLUSION

For the reasons discussed herein, the Court will grant in part and deny in part Defendant's motion. Plaintiff's claim for breach of implied warranties is dismissed with prejudice. Plaintiff's claim for breach of express warranty will proceed to trial. Plaintiff's remedy will not be limited to repair or replacement.

Lastly, the Court addresses ZSF's non-appearance in this case. The parties should, within **seven (7) days** of this Order, either stipulate to ZSF's removal from the action via the filing of an amended complaint omitting ZSF or otherwise appropriately seek to resolve ZSF's non-appearance in this case.

Accordingly,

**IT IS ORDERED** that Defendant PACCAR Inc.'s motion for summary judgment, ECF No. 16, be and the same is hereby **GRANTED in part and DENIED in part;** Plaintiff's claim of breach of implied warranties be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that the parties, within **seven (7) days** of this Order, shall either stipulate to ZSF's removal from the action via the filing of an amended complaint omitting ZSF or otherwise appropriately seek to resolve ZSF's non-appearance in this case.

---

[12]Accordingly, the Court will reject as moot Defendant's proffered disputed jury instruction as to damages, which provides that "[i]t is defendant's obligation to only provide replacement parts for any defective components . . . ." ECF No. 20 at 3. The Court now considers the joint proposed jury instructions, ECF No. 19, fully undisputed, save those instructions which are now mooted. *See supra* note 9.

Dated at Milwaukee, Wisconsin, this 12th day of February, 2024.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge